Brands *v.* DeWitt.

---

Abram Brands et al., appellants,

*v.*

James DeWitt et ux et al., respondents.

1. An heir-at-law may, for a sufficient consideration, release to his father the share which he might have at the parent's decease in his estate, either real or personal, so that he will thereby be estopped from establishing any claim thereto as one of his heirs-at-law or next of kin.

2. Such agreements, when they concern land, are like others, subject to the statute of frauds, and unless they are in writing they cannot be enforced.

---

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following conclusions :

David Brands died intestate in January, 1883, leaving seven children him surviving, and seized in fee of about one hundred and seventeen acres of land, and of some personal estate. His son Isaac was made administrator, and soon afterwards sold all the goods and chattels.

In the month of November, 1883, the said children, excepting only Jacob X., agreed to sell all said farm, and did sell to one of

35

their own number, Abram. After this sale, but on the same day, as the testimony stands, Isaac, the administrator, discovered three releases, which are the cause of this controversy. He discovered them in an old desk which he had bought at the sale of the personal property some time before. He was looking in this desk for the title deeds of the land, and while thus engaged found three releases and the deeds in one package: one given by Jacob X., one by Abram, and one by James, to their father. The two latter bear date March 30th, 1850. The recitals in them show that he had sold to each certain lands. In the releasing part each one

"Releases, discharges, and forever quit claims all right, title, interest or claim whatsoever to him, the said David Brands, and to his other children and heirs-at-law, of all the estate, both real and personal, that may be left at the decease of my father, I being fully satisfied and content, on the reception of the above-mentioned deed, for all legacies that now or ever hereafter might descend to me from the estate of my father, David Brands, * * * and that all of the estate of my father, at the time of his decease, may be divided amongst his other children and heirs-at-law or otherwise, without any claim or demand, either by myself, my heirs, executors and administrators," &c.

The consideration moving Jacob X. to give the release was $2,500 in money. The release given by him was substantially the same as the other two. It was executed October 1st, 1853.

The complainants file their bill, setting up these releases, and ask the court to declare them binding and effectual, and to decree that Rachel DeWitt, one of the complainants, is entitled to one fourth of the estate of which her father died seized. Isaac and the other two daughters answer, admitting the principal matters set up in the bill, and ask that the estate may be divided into four parts.

James, Abram and Jacob X., by their answer, insist that their father never intended that said releases should be operative. They also insist that all the other children gave releases; that their father did not intend to exclude any of his children from an equal share of his estate with the rest, and that, after these releases were given, he made equal divisions amongst them.

There is no proof that releases were executed also by the other children. There is no testimony to warrant any such belief.

I am quite free to say that I have looked into this case in the belief that I would find some evidence going to show that these releases had served the purpose for which they were designed, and that now they should not be regarded as binding. And to this end all of the testimony that seemed at all relevant was admitted. It occurred to me that these releases might have been intended to be used by the father to preserve some equality between the children until the last one should receive his or her portion. But this theory is unavailing, since there is no release produced from any of the daughters who took their portions of the division about the time Isaac and Abram took theirs, and years before Jacob X. executed his release. Nor is there any evidence, as above stated, that they ever executed any release. The father survived the execution of the release by Jacob X. about thirty years, during which long period he neither destroyed the said three releases, nor exacted one from any of his other children; and during which period he gave to each, as will be seen, $300, and loaned to Jacob X. $1,000, taking his note therefor.

The counsel for James, Abram and Jacob X. insists that, if these releases are sustained as effectual, it will work unequally, and will defeat the intention of the intestate. These considerations are based upon the general treatment of the children by the father. It is said that there is nothing in all his life to warrant the view that he intended to favor one child more than another. I am very much impressed with this consideration. The evidence shows nothing of the father's dealings with his children prior to 1850; but from that year onward, every important transaction, except the releases, tends to show that the father sought to make nearly equal distribution of his estate. I say *nearly*, because in the conveyance of the farm to Isaac, he seems to have a somewhat larger portion than any of the rest. This first distribution was made in 1850–1853, and about ten years later, another distribution was made, each child receiving $300. Upon the whole, I am quite clear that nothing follows towards annulling the

releases from the distribution of this $300 to each; for it may well be said that he had fixed the basis of equality of right in his own mind before, by the releases.    And beyond doubt, it was all his own, and he could then do what seemed to him good, without undoing what he had caused to be done before.

But after all, there are the releases.    I am confronted with them.    Does anything appear to impeach or destroy them?    Can I declare them void by the supposition of an intention that was never declared, but which rests alone in other transactions?    Can I say that to give these releases the effect which their language imports would work inequality and injustice?    How can I say that?    Who is to make distribution of an estate, the owner during his lifetime, if he wishes so to do, or the courts, after his death, according to their views of justice and equality?    And if the courts may do it, as is urged in this case, then when or at what period shall the work begin?    Can the court put itself in a father's place, and take into the account not only the innumerable items of expenses which, like a mill-race, drain a well-filed purse, but also the thankless conduct of a wayward, reckless child?    No.

There are the releases; the father had a right to take them. The money paid, and the land conveyed, to his sons were his own.    He had the right of absolute disposition of them, by gift unqualified, or with exacting conditions.    And what seems to many like an exacting condition, may have been to him the very limit of generosity.    From a legal standpoint, above all, it is to be considered that the sons saw fit to accept the consideration and to execute the releases.    Having thus under seal executed a formal release which clearly expresses the consideration, and also the object of it, and the persons in whose favor it shall operate, the sons are bound.    See *Havens* v. *Bliss, 11 C. E. Gr. 383,* and cases cited.

But when the father died there was a judgment against Jacob X., and it is claimed that that became a lien on Jacob X.'s interest in the land.    His alleged interest was levied on and sold by the sheriff, and James, one of the brothers, purchased.    He had given a release, and he now claims against his own release, and

Brands v. DeWitt.

also against this release of Jacob X. I have concluded that Jacob was bound by the release to his father, " and to his other children and heirs-at-law of all the estate, both real and personal, that may be left at the decease of my father," and I think that none of Jacob's creditors can enjoy a better or stronger position. If such agreements between a parent and child could be overcome so easily, then an unfortunate or unfaithful child could always thwart the wisest provisions of the parent. Most obviously in such case the loss should fall on the creditor, rather than on the innocent children whose interests, and it may be rights, have been guarded by the wisdom and forethought of the parent. In my opinion, James took nothing under his purchase from the sheriff.

Again, it is urged that the complainant, Rachel, is estopped because her husband advised James to purchase Jacob's interest at the sale to be made by the sheriff. It is enough to say that the husband could not bind the wife in this behalf, had he known of the existence of the releases; but there is no proof that either of the complainants had any knowledge of them until after the sheriff's sale.

An effort was made at the hearing to establish a compromise or settlement of the controversy; but it was not concluded, so far as the complainants are concerned, and therefore not binding on them.

I conclude that Rachel is entitled to one-fourth of the estate of which her father died seized, after the payment of his debts, funeral expenses and the expenses of settling his estate. I think this same relief should be extended to Isaac, Catharine and Hannah, but I can scarcely think they can have it by answer simply. However, since the case is so fully presented in all its details, nothing can be gained by delay, and I will therefore allow the answer of these three to be so amended, by way of cross-bill, as to give them a right in this suit for the relief which they seek.

I will not advise costs to either parties.

*Mr. George A. Angle*, for appellants.

*Mr. C. H. Beasley* and *Messrs. Shipman & Son*, for respondents.

The opinion of the court was delivered by

VAN SYCKEL, J.

David Brands died intestate in January, 1883, seized in fee of a farm, containing about one hundred and seventeen acres of land, and some personal estate. His seven children survived him.

Isaac, one of his sons, administered upon the personal estate and sold it.

In November, 1883, it was agreed that the real estate should be sold at public sale, and that all the children would join in making a conveyance of it to the purchaser. The farm, at that sale, was struck off to Abram Brands for $38 per acre, and he signed the conditions of sale. On the day of the sale, and after the sale, Isaac, as he alleged, discovered in an old desk, which he had purchased at the sale of the intestate's goods, three releases to the intestate, one executed by his son Jacob, one by his son Abram and one by James.

Two of the releases purported to be in consideration of land conveyed to them by their father in his lifetime, and the third in consideration of the sum of $2,500.

In the releasing part, each one

" Releases, discharges and forever quit claims all right, title, interest or claim whatsoever to him the said David Brands, and to his other children and heirs-at-law of all the estate, both real and personal, that may be left at the decease of said David, the releasor being fully satisfied and content on the reception of the above-mentioned deed for all the legacies that now or ever hereafter might descend to him from the estate of said David, and that all of the estate of said David, at the time of his decease, may be divided among his other children and heirs-at-law, or otherwise, without any claim or demand either by himself, his heirs, executors or administrators."

Upon the production of these releases, the other children claimed that Jacob, James and Abram were thereby excluded from any share in the intestate's estate, and thereupon James and Jacob refused to execute the deed of conveyance for the

farm sold to Abram. The other children executed a conveyance to Abram, but he refused to accept it because all had not joined in it.

On the 24th of May, 1884, James filed a bill in chancery for the partition of said lands, to which all the heirs-at-law were parties. After the defendants to said bill had filed their answers an agreement in writing, dated September 6th, 1884, was entered into by all the children, except Mrs. DeWitt, by the terms of which the intestate's estate was to be equally divided among all the children of decedent, notwithstanding said releases. In consideration thereof Abram signed an agreement to take the farm at $38 per acre, which it was then understood among them was a larger price than could otherwise have been obtained for it.

Thereupon, in accordance with said agreement, the partition suit, by consent of all parties, was discontinued; costs were paid to Mrs. DeWitt; and James Brands, for himself and Jacob Brands, executed the conveyance for the farm and delivered it to Abram, who accepted it and gave his obligations for the purchase-money.

In the court below the validity of the releases was upheld, and a decree made that Mrs. DeWitt, Isaac Brands, Catharine Green and Hannah Reed were each entitled to one-fourth of the estate, to the exclusion of the three who had released. Costs were allowed to the several parties out of the proceeds of sale of the land.

James Brands and Abram Brands appealed from this decree because they were denied a share of the estate, and Mrs. DeWitt appealed because costs were decreed out of the fund.

I agree with the Vice-Chancellor, that an heir-at-law may, for a sufficient consideration, release to his father the share which he might have at the parent's decease in his estate, either real or personal, so that he will be thereby estopped from establishing any claim thereto as one of his heirs-at-law or next of kin.

In *Havens* v. *Thompson, 8 C. E. Gr. 321,* Chancellor Zabriskie, in commenting on the case of *Quarels* v. *Quarels, 4 Mass. 680,* and *Kenney* v. *Tucker, 8 Mass. 143,* in which such

releases were held to be binding, said : " That whether an agreement by parol, or in writing without seal by a son to his father, on receiving advancement in money, that it shall be in full of the son's share of the father's real estate at his death, can have any effect, was questionable."

He hesitated to adopt a rule which would give effect to parol testimony in cases of such importance, and he reserved the question until the final hearing of the case.

Chancellor Runyon decided the case on final hearing, and gave full effect to the agreement to release.   *Havens* v. *Thompson, 11 C. E. Gr. 383.*

Vice-Chancellor Van Fleet, in *Green* v. *Hathaway, 9 Stew. Eq. 471,* says : " The justice of this doctrine is obvious ; it is designed, in the first place, to compel a child to abide by its promise, and thus prevent the expectation of the father from being disappointed, who, but for his trust in the promise, would have made a will ; and, in the second place, to secure equality among those who have equality of right.   But such agreements, when they concern lands, are like others, subject to the statute of frauds, and unless they are in writing cannot be enforced."   This we consider to be the correct rule, and the reason for it.   The English cases support this view.   *Hancock* v. *Hancock, 2 Vern. 665 ; Lockyer* v. *Savage, 2 Strange 947 ; Medcalf* v. *Ives, 1 Atk. 63 ; Heron* v. *Heron, 2 Atk. 160.*

I think the preponderance of evidence is against the contention on behalf of Isaac, Catharine and Hannah, that the agreement to make an equal division was executed by them, on condition that it was not to be effective until it was signed by Mrs. DeWitt.

It was very soon thereafter performed, on the part of Abram and James, who represented the share of Jacob.

The deed was executed and delivered to Abram, and the partition suit of James was discontinued, with costs to Mrs. DeWitt.

The evidence of Mr. Angle, the solicitor for Abram Brands, is, that he drew the agreement and was present at the execution of it ; that it was expressly stated, and understood by all who signed it, that Mrs. DeWitt would not sign it, and that Abram said, in the presence of all of them at that time, that he

Brands *v.* DeWitt.

would settle with Mrs. DeWitt himself. This is not denied by Abram, who was called as a witness after this testimony was given.

The agreement should be enforced as against those who executed it, but it cannot affect the rights of Mrs. DeWitt.

The result will be that Mrs. DeWitt is entitled to one-fourth of the estate, and the other children to one-seventh each.

The difference between the one-fourth and the one-seventh must be taken out of the one-seventh to which Abram is entitled, and paid to Mrs. DeWitt. This is in accordance with the obligation which Abram assumed at the settlement.

In estimating the sevenths, the payments provided for in the agreement of September 6th, 1884, and also the costs in the court below, and the costs of the appellants, Abram, James and Jacob, in this court, must first be deducted from the fund.

In estimating the one-fourth to which Mrs. DeWitt is entitled, only the costs in the court below, and the costs of said appellants in this court, must first be deducted from the fund. The appellants, Abram, James and Jacob, are entitled to costs in this court, to be paid out of the fund. The appeal of Mrs. DeWitt is dismissed, without costs. The decree should be reversed and the case remitted, that an account may be taken as hereinbefore directed.

*For affirmance*—GARRISON, BROWN, CLEMENT, WHITAKER —4.

*For reversal*—DEPUE, DIXON, KNAPP, MAGIE, SCUDDER, VAN SYCKEL, COLE, McGREGOR, PATERSON—9.